Paul Kapp - WSB #5-2267
SUNDAHL, POWERS, KAPP & MARTIN, LLC
1725 Carey Avenue
Cheyenne, Wyoming 82001
(307) 632-6421
pkapp@spkm.org
*Counsel for Plaintiff ALPS Property*
*& Casualty Insurance Company*

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2018 FEB 12  PM 1:19

STEPHAN HARRIS, CLERK
CHEYENNE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| ALPS PROPERTY & CASUALTY INSURANCE COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> NICK E. BEDUHN; GOPPERT, SMITH & BEDUHN; KURT ACTON; TANNER BEEMER; and DAROLD BROWN, <br><br> Defendants. | Case No. 18-cv-28-F <br><br><br> **COMPLAINT** |

Plaintiff ALPS Property & Casualty Insurance Company ("ALPS"), pursuant to 28 U.S.C. §§ 2201(a) and 2202 and Federal Rules of Civil Procedure 8(a) and 57, for its complaint against Defendants Nick E. Beduhn ("Beduhn"), Goppert, Smith & Beduhn ("GSB" and together with Beduhn, "GSB Defendants"), Kurt Acton ("Acton"), Tanner Beemer ("Beemer"), and Darold Brown ("Brown")[1], alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1.     ALPS is an insurance company and corporation organized under the laws of the State of Montana with its principal place of business in the State of Montana.

---

[1] ALPS will refer to the GSB Defendants, Acton, Beemer, and Brown collectively as "Defendants".

2.     Beduhn is an attorney licensed and formerly practicing in the State of Wyoming. Beduhn is not currently practicing in the State of Wyoming because the Supreme Court of Wyoming suspended Beduhn's license for two years effective May 10, 2017.

3.     Beduhn is, upon information and belief, a resident of the State of Wyoming.

4.     GSB is a law firm with its principal place of business in Cody, Wyoming. Beduhn is, upon information and belief, a principle of GSB.

5.     Acton is, upon information and belief, a former client of the GSB Defendants and a resident of the State of Wyoming.

6.     Beemer is, upon information and belief, a former client of the GSB Defendants and a resident of the State of Wyoming.

7.     Brown is, upon information and belief, a former client of the GSB Defendants and a resident of the State of Wyoming.

8.     The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1) because complete diversity exists between ALPS and Defendants, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims for relief occurred in this district.

## GENERAL ALLEGATIONS

### I.  Wyoming Bar Complaints and GSB Defendants' Misrepresentations to ALPS

10.    On February 17, 2016, Brown, a former client of Beduhn, submitted a complaint to the Wyoming Office of Bar Counsel ("Bar Counsel").   (July 13, 2017 Report and Recommendation for Two Year Order of Suspension, *In re Beduhn*, Docket Nos. 2016-030, 2016-038, 2016-047, 2016-056 & 2017-003 (Wyo. Bd. of Prof'l Responsibility, Supreme Ct.,

State of Wyo.) ("July 2017 Report"), ¶ 15.  A true and correct copy of the July 2017 Report is attached as Exhibit 1.).

11.     Brown's complaint to Bar Counsel alleged Beduhn "cost [him] any chance [he] had for a [reasonable] outcome" in Brown's child custody proceedings. (Exhibit 1 ¶ 15).

12.     Bar Counsel forwarded Brown's complaint to Beduhn and requested a response by March 3, 2016.  (Exhibit 1 ¶ 15).  Beduhn requested an extension until March 10, 2016, which Bar Counsel granted.  (*Id.*).

13.     GSB submitted an application for lawyers professional liability insurance to ALPS dated February 24, 2016 ("2016 Application").  Travis Smith ("Smith"), a principle of GSB, executed the 2016 Application.

14.     The 2016 Application did not identify Brown's pending bar complaint against Beduhn and did not disclose any potential claims against the GSB Defendants, either arising out of Brown's bar complaint or otherwise.

15.     On February 24, 2016, GSB provided ALPS with Beduhn's completed Individual Attorney Supplement to the 2016 Application, which did not identify Brown's pending bar complaint against Beduhn and did not disclose any potential claims against Beduhn, either arising out of Brown's bar complaint or otherwise.

16.     On March 3, 2016, GSB submitted its acceptance page for Lawyers Professional Liability Insurance Policy No. ALPS7055-14 issued by ALPS to GSB for the policy period February 26, 2016 to February 26, 2017 ("2016 Policy") and confirmed "there exists no changes to the answers and information set forth in the [2016] Application the firm has submitted to ALPS, including all supplements and attachments thereto."

3

17. By correspondence to Beduhn dated March 10, 2016, Bar Counsel demanded Beduhn respond to Brown's complaint, warned of Bar Counsel's concerns with Beduhn's practice, and informed Beduhn of a new complaint from a former client, Jennifer Ribera ("Ribera"), as well as concerns raised by district court judges regarding Beduhn's "neglect of client matters." (Exhibit 1 ¶ 15).

18. Bar Counsel received Beduhn's response to Brown's complaint on March 15, 2016. (Exhibit 1 ¶ 16).

19. On March 11, 2016, Bar Counsel sent Beduhn a copy of Ribera's complaint against Beduhn, which Bar Counsel had received on March 7, 2016. (Exhibit 1 ¶¶ 19, 23).

20. Ribera's complaint alleged Beduhn failed to properly keep her informed of developments in her divorce and child custody proceedings, including failing to inform her of a punitive judgment against her. (Exhibit 1 ¶¶ 18-21).

21. Bar Counsel requested Beduhn respond to Ribera's complaint by March 25, 2016. (Exhibit 1 ¶ 23).

22. On March 25, 2016, Beduhn requested an extension until April 8, 2016 to respond to Ribera's complaint, which Bar Counsel granted, but Beduhn failed to timely respond. (Exhibit 1 ¶ 23).

23. On April 6, 2016 and April 12, 2016, Bar Counsel received separate correspondence from two local district court judges—Judge John Fenn and Judge Steven Cranfill—complaining of Beduhn's conduct before the court and his handling of client matters. (Exhibit 1 ¶¶ 27-29).

24. In Judge Cranfill's April 2016 correspondence to Bar Counsel, Judge Cranfill raised concerns regarding Beduhn's representation of Brown and Beemer in their respective

divorce proceedings and summarized his concerns as follows: "In both cases, Mr. Beduhn failed to timely file a pretrial memorandum. In both cases, Mr. Beduhn was sanctioned by not allowing any witnesses other than his client to testify and no introduction of evidence." (Exhibit 1 ¶ 29).

25.     Bar Counsel forwarded Judge Fenn's and Judge Cranfill's respective complaints to Beduhn and requested he respond by April 20, 2016 and May 2, 2016, respectively. (Exhibit 1 ¶ 23). Beduhn failed to timely do so.  (*Id.*).

26.     By correspondence to Beduhn dated May 4, 2016, Bar Counsel informed Beduhn that Bar Counsel intended to move for Beduhn's immediate suspension from the Wyoming State Bar unless he responded to the multiple complaints pending against him by May 5, 2016. (Exhibit 1 ¶ 23). Beduhn obtained another extension and responded to the complaints on May 9, 2016.  (*Id.*).

27.     On January 4, 2017, Bar Counsel received another complaint from a former client of Beduhn, Beemer. (Exhibit 1 ¶ 33).

28.     Beemer's complaint alleged, *inter alia*, Beduhn missed multiple court deadlines and failed to communicate with Beemer. (Exhibit 1 ¶ 33).

29.     Bar Counsel sent Beemer's complaint to Beduhn and requested a response by January 20, 2017. (Exhibit 1 ¶ 34).

30.     GSB submitted an application for lawyers professional liability insurance to ALPS dated February 22, 2017 ("2017 Application").

31.     The 2017 Application did not identify the Wyoming State Bar complaints against Beduhn involving his representation of Brown, Beemer, Ribera, and others ("Bar Complaints") and did not disclose any potential claims against the GSB Defendants, either arising out of the Bar Complaints or otherwise.

32. The Individual Attorney Supplement to the 2017 Application Beduhn executed on February 22, 2017 did not identify the Bar Complaints and did not disclose any potential claims against Beduhn, either arising out of the Bar Complaints or otherwise.

33. On February 27, 2017, GSB submitted its acceptance page for Lawyers Professional Liability Insurance Policy No. ALPS7055-15 issued by ALPS to GSB for the policy period February 26, 2017 to February 26, 2018 ("2017 Policy"), and confirmed "there exists no changes to the answers and information set forth in the [2017] Application the firm has submitted to ALPS, including all supplements and attachments thereto."

## II. July 2017 Report and Suspension Order

34. On March 15, 2017, the Wyoming Board of Professional Responsibility ("WBPR") filed formal disciplinary charges against Beduhn arising out of the Bar Complaints and served him by certified mail. (Exhibit 1 ¶ 3).

35. Beduhn received notice of the formal charges on March 23, 2017. (Exhibit 1 ¶ 3).

36. Beduhn did not respond to WBPR's charges, a default was entered, and on May 10, 2017, the Wyoming Supreme Court entered an Order of Immediate Suspension against Beduhn. (Exhibit 1 ¶¶ 1, 5-6).

37. On July 13, 2017, the WBPR issued the July 2017 Report, which described the Bar Complaints against Beduhn and recommended the Wyoming Supreme Court suspend him from the practice of law for two years. (Exhibit 1).

38. In the July 2017 Report, the WBPR determined: (a) "there were violations of duties owed to [Beduhn's] clients, the legal system and the profession"; (b) Beduhn "acted with knowledge"; (c) Beduhn "inflicted serious injury upon his clients . . . and upon the legal system";

(d) Beduhn "engaged in a pattern of misconduct prejudicial to his clients as well as the administration of justice"; and (e) Beduhn violated multiple rules of professional conduct and American Bar Association standards of professional conduct, including, but not limited to, Rule 1.15 regarding handling of client trust accounts. (Exhibit 1 ¶¶ 44, 56-57).

39.     The July 2017 Report recommended: (a) Beduhn be suspended from the practice of law for two years; (b) Beduhn be required to reimburse Beemer $1,075.85 for legal fees and other costs incurred by Beemer; and (c) Beduhn be required to pay $3,750.00 in administrative fees and further reimburse the Wyoming State Bar for costs of the disciplinary proceedings against Beduhn in the amount of $5,475.18. (Exhibit 1 ¶ 51 & Recommendation).

40.     On August 24, 2017, the Wyoming Supreme Court entered an Order of Two Year Suspension from the Practice of Law ("Suspension Order"), which "approved, confirmed, and adopted" the July 2017 Report in its entirety. (Suspension Order, *Bd. of Prof'l Responsibility, Wyo. State Bar v. Beduhn*, Case No. D-16-0007, 2017 WY 97 (Wyo.), ¶¶ 1-2. A true and correct copy of the Suspension Order is attached as Exhibit 2.).

41.     In the Suspension Order, the Wyoming Supreme Court ordered Beduhn suspended from the practice of law for two years beginning May 10, 2017. (Exhibit 2 ¶ 3).

42.     The Suspension Order further required Beduhn (a) to pay $3,750.00 in administrative fees, (b) reimburse the Wyoming State Bar $5,475.18 for costs in handling Beduhn's disciplinary matters, and (c) reimburse Beemer for $1,075.85, the amount Beemer paid in legal fees and other court costs. (Exhibit 2 ¶¶ 5-6).

### III. The Suits

43.     On October 20, 2017, three of Beduhn's former clients—Acton, Brown, and Beemer—filed the following separate legal malpractice suits against the GSB Defendants in the

District Court of the County of Park, State of Wyoming: (a) the suit styled *Acton v. Beduhn and Goppert Smith & Beduhn*, Civil Action No. 28930 (Dist. Ct. Cty. of Park, Wyo.) ("Acton Suit"); (b) the suit styled *Beemer v. Beduhn and Goppert Smith & Beduhn*, Civil Action No. 28931 (Dist. Ct. Cty. of Park, Wyo.) ("Beemer Suit"); and (c) the suit styled *Brown v. Beduhn and Goppert Smith & Beduhn*, Civil Action No. 28932 (Dist. Ct. Cty. of Park, Wyo.) ("Brown Suit" and together with Acton Suit and Beemer Suit, "Suits").   A true and correct copy of the October 20, 2017 complaint in the Acton Suit ("Acton Complaint"), without exhibits, is attached as Exhibit 3.   A true and correct copy of the October 20, 2017 complaint in the Beemer Suit ("Beemer Complaint"), without exhibits, is attached as Exhibit 4.   A true and correct copy of the October 20, 2017 complaint in the Brown Suit ("Brown Complaint"), without exhibits, is attached as Exhibit 5.

44.     Each of the three complaints in the Suits alleges (a) legal malpractice in connection with Beduhn's representation of a client in a domestic relations matter, (b) breach of fiduciary duties, and (c) breach of contract.  (Exhibits 3-5).

### A. Acton Suit

45.     Beduhn's representation of Acton in Acton's divorce proceedings, *Acton v. Acton*, Case No. CV-027859 (Dist. Ct., Cty. of Park, Wyo.) ("Acton Divorce Suit"), began, upon information and belief, in 2015 and lasted through approximately August 10, 2016, when new counsel, Christopher J. King ("King"), entered an appearance on behalf of Acton in the Acton Divorce Suit.  (August 10, 2016 Entry of Appearance by King on behalf of Acton ("August 2016 Entry of Appearance"), Acton Divorce Suit; Park County, Wyoming District Court Docket Sheet ("Acton Divorce Docket"), Acton Divorce Suit.   A true and correct copy of the

August 2016 Entry of Appearance is attached as Exhibit 6.  A true and correct copy of the Acton Divorce Docket is attached as Exhibit 7.).

46.     The Acton Suit alleges Beduhn committed the following "acts of legal malpractice", among others, with respect to his representation of Acton in the Acton Divorce Suit: (a) failure to produce discovery responses on behalf of Acton; (b) failure to file discovery requests on behalf of Acton; (c) failure to provide witness and exhibit lists; (d) failure to respond to opposing counsel's correspondence; (e) failure to inform Acton of opposing counsel's concerns regarding Beduhn's representation of Acton; (f) failure to advise Acton as to Beduhn's inability to provide competent representation; (g) failure to reimburse Acton for all legal fees paid to Beduhn during the course of Beduhn's "negligent representation"; (h) failure to properly communicate; (i) failure to inform Acton of an attorneys' fees award entered against Acton for Beduhn's conduct; (j) failure to pursue a "directed course of litigation"; and (k) "failure to properly calculate child support causing severe overpayment related to [Acton's] income being calculated on a gross amount instead of a net amount." (Exhibit 3 ¶ 8).

47.     Acton alleges Beduhn's malpractice prevented Acton from presenting "strong and cogent" defenses to the allegations against him in the Acton Divorce Suit. (Exhibit 3 ¶ 9).

48.     Acton further alleges the "cumulative effect of the legal malpractice committed by [Beduhn] irrevocably eroded and ultimately eviscerated [Acton's] credibility with the Court and elevated the risk of an adverse outcome." (Exhibit 3 ¶ 12).

49.     Acton further alleges the GSB Defendants (a) breached their express and implied contractual obligations to Acton, and (b) breached their fiduciary duties to Acton by "failing to properly counsel and advise [Acton], by placing their own interests above [Acton's] and by generally mishandling and mismanaging" the Acton Divorce Suit. (Exhibit 3 ¶¶ 21, 24-29).

50.     Acton alleges the GSB Defendants' breaches of fiduciary duties "were committed willfully and/or with gross negligence", entitling Acton to punitive damages. (Exhibit 3 ¶ 23).

51.     Acton alleges the following damages in the Acton Suit: (a) costs and attorney's fees to "rectify the situation created by [Beduhn's] legal malpractice", including legal fees to new counsel and appellate costs; (b) financial harm caused by Beduhn's legal malpractice; and (c) punitive damages. (Exhibit 3 ¶¶ 16-17, 22-23 & Prayer for Relief).

### B.  Beemer Suit

52.     The Beemer Suit alleges Beduhn represented Beemer in a child custody proceeding and committed the following "acts of legal malpractice", among others: (a) failure to produce discovery responses on behalf of Beemer; (b) failure to file discovery requests on behalf of Beemer; (c) failure to provide witness and exhibit lists; (d) failure to respond to opposing counsel's correspondence; (e) failure to inform Beemer of opposing counsel's concerns regarding Beduhn's representation of Beemer; (f) failure to reimburse Beemer for all legal fees paid to Beduhn during the course of Beduhn's "negligent representation"; (g) failure to properly communicate; (h) failure to advise Beemer as to Beduhn's inability to provide competent representation; and (i) mismanagement of client funds held in GSB's trust account. (Exhibit 4 ¶¶ 7-8).

53.     Beemer alleges Beduhn's malpractice prevented Beemer from offering any witnesses or exhibits at trial and prevented Beemer from presenting "strong and cogent" defenses to the allegations against him in the child custody dispute. (Exhibit 4 ¶ 9).

54.     Beemer further alleges the "cumulative effect of the legal malpractice committed by [Beduhn] irrevocably eroded and ultimately eviscerated [Beemer's] credibility with the Court and elevated the risk of an adverse outcome." (Exhibit 4 ¶ 12).

55.     Beemer further alleges the GSB Defendants (a) breached their express and implied contractual obligations to Beemer, and (b) breached their fiduciary duties to Beemer by "failing to properly counsel and advise [Beemer], by placing their own interests above [Beemer's] and by generally mishandling and mismanaging [Beemer's child custody] case." (Exhibit 4 ¶¶ 21, 24-29).

56.     Beemer alleges the GSB Defendants' breaches of fiduciary duties "were committed willfully and/or with gross negligence", entitling Beemer to punitive damages. (Exhibit 4 ¶ 23).

57.     Beemer alleges the following damages in the Beemer Suit: (a) lost custody of Beemer's child; (b) costs and attorney's fees to "rectify the situation created by [Beduhn's] legal malpractice", including legal fees to new counsel and appellate costs; (c) emotional and financial harm caused by Beduhn's legal malpractice; and (d) punitive damages. (Exhibit 4 ¶¶ 14, 16-17, 22-23 & Prayer for Relief).

### C. Brown Suit

58.     The Brown Suit alleges Beduhn represented Brown in a child custody and visitation modification proceeding and committed the following "acts of legal malpractice", among others: (a) failure to produce discovery responses on behalf of Brown; (b) failure to file discovery requests on behalf of Brown; (c) failure to provide witness and exhibit lists; (d) failure to respond to opposing counsel's correspondence; (e) failure to inform Brown of opposing counsel's concerns regarding Beduhn's representation of Brown; (f) failure to reimburse Brown for all legal fees paid to Beduhn during the course of Beduhn's "negligent representation"; (g) failure to properly communicate; and (h) failure to advise Brown as to Beduhn's inability to provide competent representation. (Exhibit 5 ¶¶ 7-8).

59.     Brown alleges Beduhn's malpractice prevented Brown from offering any witnesses or exhibits at trial and prevented Brown from presenting "strong and cogent" defenses to the allegations against him in the child custody dispute. (Exhibit 5 ¶ 9).

60.     Brown further alleges his defenses were so severely compromised "that he had no reasonable chance of prevailing at trial" and the "cumulative effect of the legal malpractice committed by [Beduhn] irrevocably eroded and ultimately eviscerated [Brown's] credibility with the Court and elevated the risk of an adverse outcome." (Exhibit 5 ¶¶ 9, 12).

61.     Brown further alleges the GSB Defendants (a) breached their express and implied contractual obligations to Brown, and (b) breached their fiduciary duties to Brown by "failing to properly counsel and advise [Brown], by placing their own interests above [Brown's] and by generally mishandling and mismanaging [Brown's child custody] case." (Exhibit 5 ¶¶ 21, 24-29).

62.     Brown alleges the GSB Defendants' breaches of fiduciary duties "were committed willfully and/or with gross negligence", entitling Brown to punitive damages. (Exhibit 5 ¶ 23).

63.     Brown alleges the following damages in the Brown Suit: (a) lost custody of Brown's children; (b) costs and attorney's fees to "rectify the situation created by [Beduhn's] legal malpractice", including legal fees to new counsel and appellate costs; (c) emotional and financial harm caused by Beduhn's legal malpractice; and (d) punitive damages. (Exhibit 5 ¶¶ 14, 16-17, 22-23 & Prayer for Relief).

## IV.  The Policies

### A.  2016 Policy

64.      On February 24, 2016, Smith executed the 2016 Application for the 2016 Policy on behalf of the Named Insured, Goppert, Smith & Beduhn.

65.      In the 2016 Application, Smith answered "No" to the following questions: (a) "Are you or any member of the firm aware of or do you or any member of the firm have knowledge of any fact, circumstance, act, error, or omission that could reasonably be expected to be the basis of a claim against any current or former attorney in the firm or its predecessors, regardless of the merit of such claim that has not already been reported to ALPS?"; (b) "Has any member of the firm had an investigation, inquiry, or disciplinary complaint made to any court, administrative agency, or regulatory body in the past year?"; and (c) "Has any attorney in your firm been refused admission to practice, disbarred, suspended from practice, or been formally reprimanded by any court, administrative agency or regulatory body in the past year; or is any attorney under investigation?"

66.      On the Individual Attorney Supplement to the 2016 Application Beduhn completed and submitted to ALPS on February 24, 2016[2], Beduhn answered "No" to the following question:  "Are you aware of or do you have knowledge of any fact, circumstance, act, error, or omission that could reasonably be expected to be the basis of a claim against you, regardless of the merit of such claim?"

---

[2] Beduhn executed his Individual Attorney Supplement to the 2016 Application on February 20, 2016. The version he executed was not complete, as Beduhn failed to answer four of the first five questions in the supplement, including the following: "Are you aware of or do you have knowledge of any fact, circumstance, act, error, or omission that could reasonably be expected to be the basis of a claim against you, regardless of the merit of such claim?"  By correspondence dated February 24, 2016, ALPS requested Beduhn complete his Individual Attorney Supplement to the 2016 Application by fully answering all questions in the supplement.  Beduhn did so and GSB submitted Beduhn's completed Individual Attorney Supplement to the 2016 Application to ALPS on February 24, 2016.

67.    ALPS issued the 2016 Policy to GSB for the policy period February 26, 2016 to February 26, 2017. A true and correct copy of the 2016 Policy is attached as Exhibit 8.

68.    Beduhn is listed as an attorney insured under the 2016 Policy. (Exhibit 8, Declarations Item 2).

69.    The 2016 Policy provides legal professional liability insurance on a claims made and reported basis. (Exhibit 8, Insuring Agreements § 1.1).

70.    The 2016 Policy provides:

THIS IS A 'CLAIMS MADE AND REPORTED' INSURANCE POLICY. THEREFORE, AS A CONDITION PRECEDENT TO THE COMPANY'S OBLIGATION TO DEFEND OR INDEMNIFY THE INSURED UNDER THIS POLICY, THE INSURED MUST IMMEDIATELY REPORT ANY CLAIM TO ALPS DURING THE POLICY PERIOD OR DURING ANY APPLICABLE EXTENDED REPORTING PERIOD. NO COVERAGE EXISTS UNDER THIS POLICY FOR A CLAIM WHICH IS FIRST MADE AGAINST THE INSURED OR FIRST REPORTED TO ALPS BEFORE OR AFTER THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD.

(Exhibit 8 at 1) (emphasis in original).

71.    The 2016 Policy's insuring agreement states, in relevant part:

Subject to the limit of liability, exclusions, conditions and other terms of this policy, the Company agrees to pay on behalf of the Insured all sums (in excess of the deductible amount) that the Insured becomes legally obligated to pay as damages, arising from or in connection with A CLAIM FIRST MADE AGAINST THE INSURED AND FIRST REPORTED TO THE COMPANY DURING THE POLICY PERIOD, provided that:

1.1.1 the claim arises from an act, error, omission or personal injury that happened on or after the loss inclusion date and the retroactive coverage date set forth in Items 2 and 3 of the Declarations, and that the claim arises from or is in connection with:

(a) an act, error or omission in professional services that were or should have been rendered by the Insured, or

(b) a personal injury arising out of the professional services of the Insured;

1.1.2   at the effective date of this policy, no Insured knew or reasonably should have known or foreseen that the act, error, omission or personal injury might be the basis of a claim[.]

* * *

1.2.1 . . . The Company shall not have a duty to defend or to pay [claim] expenses as to any claim not covered under this policy, and shall have the right to seek reimbursement from any Insured, who shall promptly provide such reimbursement, for any amount paid by the Company in defending any such non-covered claim, including any amount paid in defending a non-covered claim that is asserted together with one or more covered claims.

(Exhibit 8, Insuring Agreements §§ 1.1-1.2.1) (emphasis in original).

72.     "Claim" is defined in the 2016 Policy as "a demand for money or services, including but not limited to the service of suit or institution of arbitration proceedings against the Insured[.]" (Exhibit 8, Definitions § 2.3).

73.     "Damages" is defined in the 2016 Policy as "any monetary award by way of judgment or final arbitration, or any settlement"; the 2016 Policy specifically excludes from the definition of damages:

2.6.1   punitive, multiple, or exemplary damages, fines, sanctions, penalties or citations[;]

2.6.2   awards deemed uninsurable by law;

2.6.3   injunctive, declaratory, or other equitable relief, or costs or fees incident thereto;

2.6.4   restitution, reduction, disgorgement or set-off of any fees, costs, consideration or expenses paid to or charged by an Insured, or any other funds or property of any person or entity presently or formerly held or in any manner directly or indirectly controlled by an Insured; or

2.6.5   any injury or damage to, destruction of, loss of, or loss of use of any funds or property.

(Exhibit 8, Definitions § 2.6).

74.    The 2016 Policy does not apply to any claim "arising from or in connection with . . . [a]ny dishonest, fraudulent, criminal, malicious, or intentionally wrongful or harmful act, error or omission committed by, at the direction of, or with the consent of an Insured, or any personal injury arising from such conduct[.]" (Exhibit 8, Exclusions § 3.1.1).

75.    The 2016 Policy does not apply to any claim:

[A]rising from or in connection with . . . [a]ny act, error, omission or personal injury that occurred prior to the effective date of this policy, if . . . [p]rior to the effective date of this policy, any Insured gave or should have given, to any insurer, notice of a claim or potential claim arising from the act, error, omission, or personal injury, or from any act, error, omission, or personal injury in related professional services.

(Exhibit 8, Exclusions § 3.1.5(c)).

76.    The 2016 Policy does not apply to any claim "arising from or in connection with . . . [a]ny conversion, misappropriation, improper commingling or negligent supervision by any person of client or trust account funds or property, or funds or property of any other person held or controlled by an Insured in any capacity or under any authority, including any loss or reduction in value of such funds or property[.]" (Exhibit 8, Exclusions § 3.1.8).

77.    The 2016 Policy does not apply to any claim "arising from or in connection with . . . [a]ny dispute over fees or costs, or any claim that seeks, whether directly or indirectly, the return, reimbursement or disgorgement of fees, costs, or other funds or property held by an Insured." (Exhibit 8, Exclusions § 3.1.9).

**B. 2017 Policy**

78.    On February 22, 2017, Smith executed the 2017 Application for the 2017 Policy on behalf of the Named Insured, Goppert, Smith & Beduhn.

79.    In the 2017 Application, Smith answered "No" to the following questions: (a) "Are you or any member of the firm aware of or do you or any member of the firm have

knowledge of any fact, circumstance, act, error, or omission that could reasonably be expected to be the basis of a claim against any current or former attorney in the firm or its predecessors, regardless of the merit of such claim that has not already been reported to ALPS?"; (b) "Has any member of the firm had an investigation, inquiry, or disciplinary complaint made to any court, administrative agency, or regulatory body in the past year?"; and (c) "Has any attorney in your firm been refused admission to practice, disbarred, suspended from practice, or been formally reprimanded by any court, administrative agency or regulatory body in the past year; or is any attorney under investigation?"

80.     On the Individual Attorney Supplement to the 2017 Application Beduhn executed on February 22, 2017, Beduhn answered "No" to the following question:  "Are you aware of or do you have knowledge of any fact, circumstance, act, error, or omission that could reasonably be expected to be the basis of a claim against you, regardless of the merit of such claim?"

81.     ALPS issued the 2017 Policy to GSB for the policy period February 26, 2017 to February 26, 2018.  A true and correct copy of the 2017 Policy is attached as Exhibit 9.

82.     Beduhn is listed as an attorney insured under the 2017 Policy.  (Exhibit 9, Declarations Item 2).

83.     The 2017 Policy provides legal professional liability insurance on a claims made and reported basis.  (Exhibit 9, Insuring Agreements § 1.1).

84.     The 2017 Policy provides:

THIS IS A 'CLAIMS MADE AND REPORTED' INSURANCE POLICY. THEREFORE, AS A CONDITION PRECEDENT TO THE COMPANY'S OBLIGATION TO DEFEND OR INDEMNIFY THE INSURED UNDER THIS POLICY, THE INSURED MUST IMMEDIATELY REPORT ANY CLAIM TO ALPS DURING THE POLICY PERIOD OR DURING ANY APPLICABLE EXTENDED REPORTING PERIOD. NO COVERAGE EXISTS UNDER THIS POLICY FOR A CLAIM WHICH IS FIRST MADE AGAINST THE INSURED

17

OR FIRST REPORTED TO ALPS BEFORE OR AFTER THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD.

(Exhibit 9 at 1) (emphasis in original).

85.    The 2017 Policy's insuring agreement states, in relevant part:

Subject to the limit of liability, exclusions, conditions and other terms of this policy, the Company agrees to pay on behalf of the Insured all sums (in excess of the deductible amount) that the Insured becomes legally obligated to pay as damages, arising from or in connection with A CLAIM FIRST MADE AGAINST THE INSURED AND FIRST REPORTED TO THE COMPANY DURING THE POLICY PERIOD, provided that:

1.1.1 the claim arises from an act, error, omission or personal injury that happened on or after the loss inclusion date and the retroactive coverage date set forth in Items 2 and 3 of the Declarations, and that the claim arises from or is in connection with:

(a) an act, error or omission in professional services that were or should have been rendered by the Insured, or

(b) a personal injury arising out of the professional services of the Insured;

1.1.2 at the effective date of this policy, no Insured knew or reasonably should have known or foreseen that the act, error, omission or personal injury might be the basis of a claim[.]

\* \* \*

1.2.1 . . . The Company shall not have a duty to defend or to pay [claim] expenses as to any claim not covered under this policy, and shall have the right to seek reimbursement from any Insured, who shall promptly provide such reimbursement, for any amount paid by the Company in defending any such non-covered claim, including any amount paid in defending a non-covered claim that is asserted together with one or more covered claims.

(Exhibit 9, Insuring Agreements §§ 1.1-1.2.1) (emphasis in original).

86.    "Claim" is defined in the 2017 Policy as "a demand for money or services, including but not limited to the service of suit or institution of arbitration proceedings against the Insured[.]" (Exhibit 9, Definitions § 2.3).

87.    "Damages" is defined in the 2017 Policy as "any monetary award by way of judgment or final arbitration, or any settlement"; the 2017 Policy specifically excludes from the definition of damages:

2.6.1    punitive, multiple, or exemplary damages, fines, sanctions, penalties or citations[;]

2.6.2    awards deemed uninsurable by law;

2.6.3    injunctive, declaratory, or other equitable relief, or costs or fees incident thereto;

2.6.4    restitution, reduction, disgorgement or set-off of any fees, costs, consideration or expenses paid to or charged by an Insured, or any other funds or property of any person or entity presently or formerly held or in any manner directly or indirectly controlled by an Insured; or

2.6.5    any injury or damage to, destruction of, loss of, or loss of use of any funds or property.

(Exhibit 9, Definitions § 2.6).

88.    The 2017 Policy does not apply to any claim "arising from or in connection with . . . [a]ny dishonest, fraudulent, criminal, malicious, or intentionally wrongful or harmful act, error or omission committed by, at the direction of, or with the consent of an Insured, or any personal injury arising from such conduct[.]"  (Exhibit 9, Exclusions § 3.1.1).

89.    The 2017 Policy does not apply to any claim:

[A]rising from or in connection with . . . [a]ny act, error, omission or personal injury that occurred prior to the effective date of this policy, if . . . [p]rior to the effective date of this policy, any Insured gave or should have given, to any insurer, notice of a claim or potential claim arising from the act, error, omission, or personal injury, or from any act, error, omission, or personal injury in related professional services.

(Exhibit 9, Exclusions § 3.1.5(c)).

90.    The 2017 Policy does not apply to any claim "arising from or in connection with . . . [a]ny conversion, misappropriation, improper commingling or negligent supervision by

any person of client or trust account funds or property, or funds or property of any other person held or controlled by an Insured in any capacity or under any authority, including any loss or reduction in value of such funds or property[.]" (Exhibit 9, Exclusions § 3.1.8).

91.     The 2017 Policy does not apply to any claim "arising from or in connection with . . . [a]ny dispute over fees or costs, or any claim that seeks, whether directly or indirectly, the return, reimbursement or disgorgement of fees, costs, or other funds or property held by an Insured." (Exhibit 9, Exclusions § 3.1.9).

### V. Notice to ALPS and ALPS's Coverage Position

92.     By correspondence from Smith dated November 1, 2017 ("November 1, 2017 Correspondence"), GSB first notified ALPS of the Suits and provided ALPS with copies of the Acton Complaint, the Beemer Complaint, and the Brown Complaint.

93.     The July 2017 Report and the Suspension Order were attached as exhibits to the Acton Complaint, the Beemer Complaint, and the Brown Complaint provided to ALPS by the November 1, 2017 Correspondence.

94.     The November 1, 2017 Correspondence was the first notice provided to ALPS of the Bar Complaints against Beduhn, the July 2017 Report, and the Suspension Order.

95.     By correspondence dated November 17, 2017, Beduhn separately provided notice of the Suits to ALPS and informed ALPS of his suspension from the practice of law.

96.     By correspondence dated November 28, 2017, ALPS denied coverage for the GSB Defendants under the 2017 Policy with respect to the Suits.

### FIRST CAUSE OF ACTION

**(For a Declaration the 2016 Policy Does Not Afford Coverage to
the GSB Defendants for the Suits)**

97.     ALPS incorporates and realleges paragraphs 1 through 96 as if fully set forth herein.

98.     The 2016 Policy only provides coverage for claims if "at the effective date of this policy, no Insured knew or reasonably should have known or foreseen that the act, error, omission or personal injury might be the basis of a claim[.]"     (Exhibit 8, Insuring Agreements §§ 1.1-1.1.2).

99.     The 2016 Policy specifically excludes coverage for:

> [A]ny claim arising from or in connection with . . . [a]ny act, error, omission or personal injury" that occurred prior to the 2016 Policy's February 26, 2016 effective date, "if . . . [p]rior to the effective date, any Insured gave or should have given, to any insurer, notice of a claim or potential claim arising from the act, error, omission, or personal injury, or from any act, error, omission, or personal injury in related professional services[.]

(Exhibit 8, Exclusions § 3.1.5(c)).

100.     On February 17, 2016, prior to the 2016 Policy's February 26, 2016 effective date, Brown submitted his bar complaint against Beduhn to Bar Counsel. (Exhibit 1 ¶ 15).

101.     Bar Counsel notified Beduhn of Brown's bar complaint prior to the February 26, 2016 effective date of the 2016 Policy. (*See* Exhibit 1 ¶ 15).

102.     The Brown Suit is outside the coverage afforded by the 2016 Policy because: (a) prior to the February 26, 2016 effective date of the 2016 Policy, the GSB Defendants knew of Brown's bar complaint and knew of the allegations by Brown that form the basis of his bar complaint and the Brown Suit; (b) prior to the 2016 Policy's February 26, 2016 effective date, the GSB Defendants knew or reasonably should have known Beduhn's acts, errors, or omissions

alleged in Brown's bar complaint and the Brown Suit might be the basis of a claim; (c) prior to the 2016 Policy's February 26, 2016 effective date, the GSB Defendants should have given ALPS notice of Brown's bar complaint or the claims and potential claims against the GSB Defendants arising from the acts, errors, or omissions that form the basis of Brown's bar complaint and the Brown Suit; and (d) the GSB Defendants failed to notify ALPS of Brown's bar complaint, or the claims and potential claims against the GSB Defendants arising from the acts, errors, or omissions that form the basis of Brown's bar complaint and the Brown Suit, until November 1, 2017, after inception and expiration of the 2016 Policy.

103. Coverage under the Policy is limited to claims first made and reported to ALPS during the policy period of February 26, 2016 to February 26, 2017. (Exhibit 8, Insuring Agreements § 1.1 and Declarations Item 3).

104. All of the Bar Complaints against Beduhn were submitted to Bar Counsel between February 17, 2016 and January 4, 2017. (Exhibit 1 ¶¶ 15, 19, 23, 27-29, 33-34).

105. Specifically, Brown submitted his complaint to Bar Counsel on February 17, 2016, and Bar Counsel informed Beduhn of Brown's complaint in late February 2016; Beemer submitted his complaint to Bar Counsel by correspondence dated January 4, 2017, and Bar Counsel informed Beduhn of Beemer's complaint in January 2017. (Exhibit 1 ¶¶ 15, 19, 23, 27-29, 33-34).

106. Brown's February 17, 2016 bar complaint, which alleges legal malpractice against Beduhn and forms the basis of the Brown Suit, is a claim against Beduhn and such claim was first made prior to the February 26, 2016 effective date of the 2016 Policy. (Exhibit 1 ¶ 15).

107. Beemer's January 4, 2017 bar complaint, which alleges legal malpractice against Beduhn and forms the basis of the Beemer Suit, is a claim against Beduhn under the 2016 Policy

and such claim was first made during the policy period for the 2016 Policy. (Exhibit 1 ¶¶ 33-34).

108.   GSB first reported the Suits to ALPS on November 1, 2017, after expiration of the 2016 Policy.

109.   The Brown Suit is outside the coverage afforded by the 2016 Policy because Brown's claim against Beduhn was neither made nor reported during the 2016 Policy period— Brown made a claim against Beduhn on February 17, 2016, prior to the February 26, 2016 effective date of the 2016 Policy, and the GSB Defendants did not report Brown's claim to ALPS until November 1, 2017, after expiration of the 2016 Policy. (Exhibit 1 ¶ 15).

110.   In the alternative, to the extent Brown made a claim against Beduhn during the 2016 Policy period, the Brown Suit is outside the coverage afforded by the 2016 Policy because the GSB Defendants did not report Brown's claim to ALPS until November 1, 2017, after expiration of the 2016 Policy.

111.   The Beemer Suit is outside the coverage afforded by the 2016 Policy because Beemer made a claim against Beduhn in January 2017, during the 2016 Policy period, but the GSB Defendants did not report Beemer's claim to ALPS until November 1, 2017, after expiration of the 2016 Policy. (Exhibit 1 ¶¶ 33-34).

112.   The Acton Suit is outside the coverage afforded by the 2016 Policy because, regardless of when Acton's claim against Beduhn was first made, the GSB Defendants did not report Acton's claim to ALPS until November 1, 2017, after expiration of the 2016 Policy.

113.   The 2016 Policy does not afford coverage for the Suits to the extent the relief sought in the Suits does not constitute "Damages" as defined in the 2016 Policy. (Exhibit 8, Insuring Agreements § 1.1 & Definitions § 2.6).

114.    The 2016 Policy specifically excludes from the definition of damages "punitive, multiple or exemplary damages," and "injunctive, declaratory, or other equitable relief, or costs or fees incident thereto[.]" (Exhibit 8, Definitions §§ 2.6.1 and 2.6.3).

115.    The Suits allege, *inter alia*, punitive damages and "emotional harm" caused by Beduhn's legal malpractice and the GSB Defendants' breaches of their fiduciary duties, which are not "Damages" within the 2016 Policy's coverage. (Exhibit 3 ¶¶ 16-17, 22-23 & Prayer for Relief; Exhibit 4 ¶¶ 14, 16-17, 22-23 & Prayer for Relief; Exhibit 5 ¶¶ 14, 16-17, 22-23 & Prayer for Relief).

116.    The 2016 Policy does not afford coverage for the Suits to the extent any exclusions in the 2016 Policy apply to exclude coverage. (Exhibit 8, Exclusions § 3).

117.    The 2016 Policy specifically excludes coverage for any claim "arising from or in connection with . . . [a]ny dishonest, fraudulent, criminal, malicious, or intentionally wrongful or harmful act, error or omission committed by, at the direction of, or with the consent of any Insured, or any personal injury arising from such conduct[.]" (Exhibit 8, Exclusions § 3.1.1).

118.    The Suits allege: (a) Beduhn "intentionally put his own financial interests ahead of the interests of his client"; and (b) the GSB Defendants breached their fiduciary duties to Acton, Beemer, and Brown "willfully and/or with gross negligence". (Exhibit 3 ¶¶ 13, 23; Exhibit 4 ¶¶ 13, 23; Exhibit 5 ¶¶ 13, 23).

119.    The Suits are outside the coverage afforded by the 2016 Policy because they arise from or in connection with dishonest, fraudulent, criminal, malicious, or intentionally wrongful or harmful acts, errors, or omissions committed by the GSB Defendants. (Exhibit 3 ¶¶ 13, 23; Exhibit 4 ¶¶ 13, 23; Exhibit 5 ¶¶ 13, 23).

120.    The 2016 Policy specifically excludes coverage for "any claim arising from or in connection with . . . [a]ny conversion, misappropriation, improper commingling or negligent supervision by any person of client or trust account funds or property, or funds or property of any person held or controlled by an Insured in any capacity or under any authority, including any loss or reduction in value of such funds or property[.]" (Exhibit 8, Exclusions § 3.1.8).

121.    The Beemer Suit alleges the GSB Defendants mismanaged client funds held in GSB's trust account. (Exhibit 4 ¶ 8).

122.    The Beemer Suit is outside the coverage afforded by the 2016 Policy because it arises from or in connection with the GSB Defendants' "conversion, misappropriation, improper commingling[,] or negligent supervision" of Beemer's funds or property. (Exhibit 4 ¶ 8).

123.    The 2016 Policy specifically excludes coverage for "any claim arising from or in connection with . . . [a]ny dispute over fees or costs, or any claim that seeks, whether directly or indirectly, the return, reimbursement or disgorgement of fees, costs, or other funds or property held by an Insured." (Exhibit 8, Exclusions § 3.1.9).

124.    The Suits allege Beduhn "fail[ed] to reimburse [Acton, Beemer, and Brown] all legal fees paid during the course of [Beduhn's] negligent representation[.]" (Exhibit 3 ¶ 8; Exhibit 4 ¶ 8; Exhibit 5 ¶ 8).

125.    The Beemer Suit further alleges the GSB Defendants mismanaged client funds held in GSB's trust account. (Exhibit 4 ¶ 8).

126.    In the Suspension Order, the Wyoming Supreme Court ordered Beduhn to reimburse Beemer for $1,075.85, the amount Beemer incurred in legal fees and other court costs. (Exhibit 2 ¶ 6).

127.    The Suits are outside the coverage afforded by the 2016 Policy because they (a) arise from or in connection with a dispute over fees and expenses, and (b) seek the return, reimbursement, or disgorgement of legal fees paid to, or other funds or property held by, the GSB Defendants.  (Exhibit 2 ¶ 6; Exhibit 3 ¶ 8; Exhibit 4 ¶ 8; Exhibit 5 ¶ 8).

128.    An actual controversy exists between ALPS and Defendants regarding whether the 2016 Policy affords coverage for the Suits.

129.    Because the Suits are outside the coverage afforded by the 2016 Policy, ALPS is entitled to a declaratory judgment in its favor, pursuant to 28 U.S.C. § 2201, declaring the 2016 Policy does not afford coverage for the Suits and ALPS has no duty to defend or indemnify the GSB Defendants with respect to the Suits.

## SECOND CAUSE OF ACTION

### (For a Declaration the 2017 Policy Does not Afford Coverage to the GSB Defendants for the Suits)

130.    ALPS incorporates and realleges paragraphs 1 through 129 as if fully set forth herein.

131.    The 2017 Policy only provides coverage for claims if "at the effective date of this policy, no Insured knew or reasonably should have known or foreseen that the act, error, omission or personal injury might be the basis of a claim[.]"    (Exhibit 9, Insuring Agreements §§ 1.1-1.1.2).

132.    The 2017 Policy specifically excludes coverage for:

[A]ny claim arising from or in connection with . . . [a]ny act, error, omission or personal injury" that occurred prior to the 2017 Policy's February 26, 2017 effective date, "if . . . [p]rior to the effective date, any Insured gave or should have given, to any insurer, notice of a claim or potential claim arising from the act, error, omission, or personal injury, or from any act, error, omission, or personal injury in related professional services[.]

(Exhibit 9, Exclusions § 3.1.5(c)).

133.    By early January 2017, prior to the 2017 Policy's February 26, 2017 effective date, Bar Counsel had notified Beduhn of all Bar Complaints pending against him. (Exhibit 1 ¶¶ 15, 19, 23, 27-29, 33-34).

134.    Specifically, Bar Counsel notified Beduhn of: (a) Brown's bar complaint and allegations against Beduhn in late February 2016; (b) Ribera's bar complaint and allegations against Beduhn by correspondence dated March 10, 2016; (c) various district court judges' complaints against Beduhn in April 2016, including Judge Cranfill's complaint regarding Beduhn's representation of Brown and Beemer; and (d) Beemer's bar complaint and allegations against Beduhn in early January 2017. (Exhibit 1 ¶¶ 15, 19, 23, 27-29, 33-34).

135.    By August 10, 2016, when King replaced Beduhn as Acton's counsel in the Acton Divorce Suit, Beduhn knew or reasonably should have known or foreseen he had breached a professional duty owed Acton in the Acton Divorce Suit and that Beduhn's conduct in the Acton Divorce Suit might be the basis of a claim against Beduhn by Acton. (*See* Exhibit 6).

136.    The Suits are outside the coverage afforded by the 2017 Policy because: (a) prior to the February 26, 2017 effective date of the 2017 Policy, the GSB Defendants knew of the Bar Complaints and knew of the allegations by Beduhn's clients and former clients that form the basis of the Bar Complaints and the Suits; (b) prior to the 2017 Policy's February 26, 2017 effective date, the GSB Defendants knew or reasonably should have known Beduhn's acts, errors, or omissions alleged in the Bar Complaints and the Suits might be the basis of a claim; (c) prior to the 2017 Policy's February 26, 2017 effective date, the GSB Defendants should have given ALPS notice of the Bar Complaints or the claims and potential claims against the GSB Defendants arising from the acts, errors, or omissions that form the basis of the Bar

Complaints and the Suits; and (d) the GSB Defendants failed to notify ALPS of the Bar Complaints, or the claims and potential claims against the GSB Defendants arising from the acts, errors, or omissions that form the basis of the Bar Complaints and the Suits, until November 1, 2017, after inception of the 2017 Policy.

137.    Coverage under the 2017 Policy is limited to claims first made and reported to ALPS during the policy period of February 26, 2017 to February 26, 2018. (Exhibit 9, Insuring Agreements § 1.1 and Declarations Item 3).

138.    All of the Bar Complaints against Beduhn were submitted to Bar Counsel in the February 2016 to January 2017 time period, and Bar Counsel informed Beduhn of all the Bar Complaints against him prior to the February 26, 2017 effective date of the 2017 Policy. (Exhibit 1 ¶¶ 15, 19, 23, 27-29, 33-34).

139.    Specifically, Brown submitted his complaint to Bar Counsel on February 17, 2016, and Bar Counsel informed Beduhn of Brown's complaint in late February 2016; Beemer submitted his complaint to Bar Counsel by correspondence dated January 4, 2017, and Bar Counsel informed Beduhn of Beemer's complaint in January 2017. (Exhibit 1 ¶¶ 15, 19, 23, 27-29, 33-34).

140.    Brown's February 17, 2016 bar complaint, which alleges legal malpractice against Beduhn and forms the basis of the Brown Suit, is a claim against Beduhn and such claim was first made prior to the February 26, 2017 effective date of the 2017 Policy. (Exhibit 1 ¶ 15).

141.    Beemer's January 4, 2017 bar complaint, which alleges legal malpractice against Beduhn and forms the basis of the Beemer Suit, is a claim against Beduhn and such claim was first made prior to the February 26, 2017 effective date of the 2017 Policy. (Exhibit 1 ¶¶ 33-34).

142.    GSB first reported the Brown Suit and the Beemer Suit to ALPS on November 1, 2017.

143.    The Brown Suit is outside the coverage afforded by the 2017 Policy because Brown made a claim against Beduhn prior to the February 26, 2017 effective date of the 2017 Policy, but the GSB Defendants did not report Brown's claim to ALPS until November 1, 2017, after the effective date of the 2017 Policy. (Exhibit 1 ¶ 15).

144.    The Beemer Suit is outside the coverage afforded by the 2017 Policy because Beemer made a claim against Beduhn prior to the February 26, 2017 effective date of the 2017 Policy, but the GSB Defendants did not report Beemer's claim to ALPS until November 1, 2017, after the effective date of the 2017 Policy. (Exhibit 1 ¶¶ 33-34).

145.    The 2017 Policy does not afford coverage for the Suits to the extent the relief sought in the Suits does not constitute "Damages" as defined in the 2017 Policy.  (Exhibit 9, Insuring Agreements § 1.1 & Definitions § 2.6).

146.    The 2017 Policy specifically excludes from the definition of damages "punitive, multiple or exemplary damages," and "injunctive, declaratory, or other equitable relief, or costs or fees incident thereto[.]" (Exhibit 9, Definitions §§ 2.6.1 and 2.6.3).

147.    The Suits allege, *inter alia*, punitive damages and "emotional harm" caused by Beduhn's legal malpractice and the GSB Defendants' breaches of their fiduciary duties, which are not "Damages" within the 2017 Policy's coverage.  (Exhibit 3 ¶¶ 16-17, 22-23 & Prayer for Relief; Exhibit 4 ¶¶ 14, 16-17, 22-23 & Prayer for Relief; Exhibit 5 ¶¶ 14, 16-17, 22-23 & Prayer for Relief).

148.    The 2017 Policy does not afford coverage for the Suits to the extent any exclusions in the 2017 Policy apply to exclude coverage.  (Exhibit 9, Exclusions § 3).

149.    The 2017 Policy specifically excludes coverage for any claim "arising from or in connection with . . . [a]ny dishonest, fraudulent, criminal, malicious, or intentionally wrongful or harmful act, error or omission committed by, at the direction of, or with the consent of any Insured, or any personal injury arising from such conduct[.]"  (Exhibit 9, Exclusions § 3.1.1).

150.    The Suits allege: (a) Beduhn "intentionally put his own financial interests ahead of the interests of his client"; and (b) the GSB Defendants breached their fiduciary duties to Acton, Beemer, and Brown "willfully and/or with gross negligence".  (Exhibit 3 ¶¶ 13, 23; Exhibit 4 ¶¶ 13, 23; Exhibit 5 ¶¶ 13, 23).

151.    The Suits are outside the coverage afforded by the 2017 Policy because they arise from or in connection with dishonest, fraudulent, criminal, malicious, or intentionally wrongful or harmful acts, errors, or omissions committed by the GSB Defendants.  (Exhibit 3 ¶¶ 13, 23; Exhibit 4 ¶¶ 13, 23; Exhibit 5 ¶¶ 13, 23).

152.    The 2017 Policy specifically excludes coverage for "any claim arising from or in connection with . . . [a]ny conversion, misappropriation, improper commingling or negligent supervision by any person of client or trust account funds or property, or funds or property of any person held or controlled by an Insured in any capacity or under any authority, including any loss or reduction in value of such funds or property[.]"  (Exhibit 9, Exclusions § 3.1.8).

153.    The Beemer Suit alleges the GSB Defendants mismanaged client funds held in GSB's trust account.  (Exhibit 4 ¶ 8).

154.    The Beemer Suit is outside the coverage afforded by the 2017 Policy because it arises from or in connection with the GSB Defendants' "conversion, misappropriation, improper commingling[,] or negligent supervision" of Beemer's funds or property.  (Exhibit 4 ¶ 8).

155.   The 2017 Policy specifically excludes coverage for "any claim arising from or in connection with . . . [a]ny dispute over fees or costs, or any claim that seeks, whether directly or indirectly, the return, reimbursement or disgorgement of fees, costs, or other funds or property held by an Insured." (Exhibit 9, Exclusions § 3.1.9).

156.   The Suits allege Beduhn "fail[ed] to reimburse [Acton, Beemer, and Brown] all legal fees paid during the course of [Beduhn's] negligent representation[.]"   (Exhibit 3 ¶ 8; Exhibit 4 ¶ 8; Exhibit 5 ¶ 8).

157.   The Beemer Suit further alleges the GSB Defendants mismanaged client funds held in GSB's trust account. (Exhibit 4 ¶ 8).

158.   In the Suspension Order, the Wyoming Supreme Court ordered Beduhn to reimburse Beemer for $1,075.85, the amount Beemer incurred in legal fees and other court costs. (Exhibit 2 ¶ 6).

159.   The Suits are outside the coverage afforded by the 2017 Policy because they (a) arise from or in connection with a dispute over fees and expenses, and (b) seek the return, reimbursement, or disgorgement of legal fees paid to, or other funds or property held by, the GSB Defendants.  (Exhibit 2 ¶ 6; Exhibit 3 ¶ 8; Exhibit 4 ¶ 8; Exhibit 5 ¶ 8).

160.   An actual controversy exists between ALPS and Defendants regarding whether the 2017 Policy affords coverage for the Suits.

161.   Because the Suits are outside the coverage afforded by the 2017 Policy, ALPS is entitled to a declaratory judgment in its favor, pursuant to 28 U.S.C. § 2201, declaring the 2017 Policy does not afford coverage for the Suits and ALPS has no duty to defend or indemnify the GSB Defendants with respect to the Suits.

WHEREFORE, ALPS prays that judgment be entered in its favor and against Defendants as follows:

1.     Declaring the 2016 Policy does not afford coverage to the GSB Defendants for the Suits and ALPS has no duty to defend or indemnify the GSB Defendants under the 2016 Policy;

2.     Declaring the 2017 Policy does not afford coverage to the GSB Defendants for the Suits and ALPS has no duty to defend or indemnify the GSB Defendants under the 2017 Policy; and

3.     Awarding ALPS such additional relief as shall be deemed appropriate in the circumstances, together with its costs and expenses.

**DATED** this _____ day of February 2018.

Paul Kapp – WSB #5-2267
Sundahl, Powers, Kapp & Martin, LLC
1725 Carey Avenue (82001)
P.O. Box 328
Cheyenne, WY  82003-0328
(307) 632-6421
pkapp@spkm.org
*Attorney for Plaintiff ALPS Property*
*& Casualty Insurance Company*